HEATHER E. WILLIAMS, #122664
Federal Defender
TIMOTHY ZINDEL, #158377
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax 916-498-5710
timothy_zindel@fd.org

Attorney for Defendant
PAMELA STEPHANIE EMANUEL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:17-CR-0060 MCE |
| Plaintiff, | ) | |
| | ) | **EMERGENCY MOTION TO REDUCE** |
| vs. | ) | **SENTENCE UNDER 18 U.S.C. §** |
| | ) | **3582(c)(1)(A)(i) (COVID-19)** |
| PAMELA STEPHANIE EMANUEL, | ) | |
| Defendant. | ) | Judge:  Hon. Morrison C. England, Jr. |
| _____ | ) | |

1

**TABLE OF CONTENTS**

Memorandum of Points and Authorities.

      A.    Procedural Background.

      B.    Applicable Law.

      C.    Ms. Emanuel Has No Warden and Exhaustion Should Therefore Be Waived or Satisfied.

      D.    Extraordinary and Compelling Reasons Warrant a Reduction of Ms. Emanuel's Sentence to Assure Her Safety During the Pandemic.

            **i.**    **The Court May Determine What Reasons Are Extraordinary and Compelling**

            **ii.**    **Ms. Emanuel's Medical Conditions Warrant a Sentence Reduction.**

            **iii.**    **The COVID-19 Pandemic Presents Multiple Extraordinary and Compelling Reasons Warranting a Sentence Reduction.**

            **iv.**    **Ms. Emanuel Should Be Released.**

            **v.**    **Ms. Emanuel's Family Prepared Her Release Plan.**

**E.**    **Conclusion.**

**TABLE OF AUTHORITIES**

**Federal Court Opinions**

United States v. Beck,
    425 F.Supp. 3d 573 (M.D.N.C. 2019)(i) ................................................................. 8

United States v. Brown,
    411 F. Supp. 3d 446 (S.D. Iowa 2019) .................................................................. 8

United States v. Feucht, No. 11-CR-60025,
    2020 WL 2781600 (S.D. Fla. May 28, 2020) ........................................................ 6

United States v. Fox, No. 2:14-cr-03-DBH,
    2019 WL 3046086 (D. Me. July 11, 2019) ........................................................... 9

United States v. Teresa Ann Gonzalez, No. 2:18-CR-0232-TOR-15,
    2020 WL 1536155 (E.D. Wash. Mar. 31, 2020) ................................................... 6

United States v. Jepsen, No. 3:19-CV-73
    (VLB), 2020 WL 1640232 (D. Conn. Apr. 1, 2020) ............................................. 6

United States v. Lucas,
    2020 WL 2059735 at *4 (W.D.N.Y April 29, 2020) ........................................... 16

United States v. Marks,
    No. 03-6033, 2020 WL 1908911 (W.D.N.Y. Apr. 20, 2020) ................................ 8

United States v. Mondaca, No. 89-CR-0655 DMS,
    2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) ........................................................ 8

United States v. Nkanga, No. 18-CR-713,
    2020 U.S. Dist. LEXIS 56188 (S.D.N.Y. Mar. 31, 2020) ............................... 15, 16

United States v. Pabon, No. 17-165-1,
    2020 WL 2112265 (E.D. Pa. May 4, 2020) .......................................................... 8

United States v. Perez, No. 88-10094-1-JTM,
    2020 WL 1180719 (D. Kan. Mar. 11, 2020)(t) ..................................................... 9

United States v. Redd, No. 1:97-CR-00006-AJT,
    2020 WL 1248493 (E.D. Va. Mar. 16, 2020) .................................................... 5, 9

United States v. Schafer,
    No. 18-6152, 2020 WL 2519726 (W.D.N.Y. May 18, 2020) ................................ 8

United States v. Skelos,
    2020 WL 1847558 (S.D.N.Y. Apr. 12, 2020) ..................................................... 14

United States v. Young, *supra,* No. 00-02-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ................................................................................................................. 8

ii

**United States Code**

Title 18 United States Code

    § 1028A ........................................................................................ 3

    § 1341 ......................................................................................... 3

    § 3553 ............................................................................... 2, 5, 17

    § 3582 ................................................................................. passim

Title 28 United States Code

    § 994 .......................................................................................... 7

**Other**

First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018) ........................................................................................... 5

Black's Law Dictionary ......................................................... 12, 13

United States Sentencing Guideline

    § 1B1.13 .............................................................................. passim

BOP has faced widespread criticism about the methods of its reporting and the accuracy of its statistics https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#594b8fdb12c7 ............................................................. 4

https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters ...................................................................................... 10

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html1 ...................................................................................... 11

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html ................... 11

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#asthma ...................................................................................... 11, 12

https://www.cdc.gov/covid-data-tracker/#cases..................................... 13

https://www.bop.gov/coronavirus/.................................................... 14

*Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), https://perma.cc/KGP7-PDVJ. .......... 14

K. Blakinger & K. Hamilton, "I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps, The Marshall Project (June 18, 2020). https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps ................................................... 14

Memorandum, April 3, 2020, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19  https://www.justice.gov/file/1266661/download. ................ 15

https://www.sfchronicle.com/crime/article/Newsom-to-announce-8-000-new-prison-releases-15399956.php   ...................................................................................... 15

https://lompocrecord.com/news/local/crime-and-courts/lompoc-prison-ordered-to-begin-release-of-inmates-to-home-confinement-due-to-covid-19/article_a8713d25-6499-582a-a9b1-89e1c63cf803.html .......................................................................... 16

iv

HEATHER E. WILLIAMS, #122664
Federal Defender
TIMOTHY ZINDEL, #158377
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA  95814
Tel: 916-498-5700/Fax 916-498-5710
timothy_zindel@fd.org

Attorney for Defendant
PAMELA STEPHANIE EMANUEL

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:17-CR-0060 MCE |
| Plaintiff, | ) | |
| vs. | ) | **EMERGENCY MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)(i) (COVID-19)** |
| PAMELA STEPHANIE EMANUEL, | ) | |
| Defendant. | ) | Judge:  Hon. Morrison C. England, Jr. |
| | ) | |

Defendant Pamela Emanuel moves for an order reducing her sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling circumstances" in light of the COVID-19 pandemic, which within the past three weeks has broken out at both Nevada Southern Detention Center (where she is now housed) and at the Victorville prison complex (where BOP has designated her to serve the remaining 26 months of her 75-month sentence).

The COVID-19 pandemic puts Ms. Emanuel at grave risk of death or illness because she has multiple, active, documented medical conditions, including asthma, obesity, and hypertension, all of which are conditions the Center for Disease Control recognizes as posing special risks to persons with COVID-19.  The conditions are exacerbated by her age (59), ethnicity (African-American), and mental health (PTSD), factors also recognized as increasing her COVID-19 risks.

1         Ms. Emanuel has two viable release options – she is able to live with her

2   daughter Pamela Edy Emanuel in San Jose or with her older sister Vickie Johnson in

3   Stockton. She has served well over half of her prison term (39 months) and has less

4   than 26 months until her projected release date (September 14, 2022, per the BOP's

5   online inmate locator).  She is willing to serve the remainder of her term on home

6   detention if the Court so requires.

7         Ms. Emanuel managed to dodge the virus while in Sacramento County Jail for

8   several months after sentencing.  Three weeks ago she alerted counsel to the rumor of

9   an outbreak at Pahrump, where she was placed pending delivery to the minimum-

10  security Victorville Camp.  The Marshal has confirmed the outbreak.  Meanwhile, the

11  virus hit the entire Victorville complex, where it may be about to explode, as it has in

12  other prisons.  Because Ms. Emanuel has never reached the BOP, the Bureau will not

13  consider shifting her to home detention.  Under these circumstances, a sentence

14  reduction to time served, with or without an additional term of home confinement as a

15  condition of supervised release, will reduce the risk of complications from COVID-19

16  and is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).

17        This motion is based on the following memorandum of points and authorities,

18  exhibits, and any other evidence or argument presented before decision.  Defense

19  counsel asks for an opportunity to respond should the government file opposition to this

20  motion and is available on short notice for a hearing if desired.

21                                 Respectfully submitted,

22                                 HEATHER WILLIAMS
                                   Federal Public Defender
23

24  Dated:  July 28, 2020         */s/ Tim Zindel*
                                   TIMOTHY ZINDEL
25                                 Attorney for PAMELA EMANUEL

26

27

28

# Memorandum of Points and Authorities.

The COVID-19 pandemic has severely plagued jails and prisons while Ms. Emanuel, who has yet to reach the BOP, remains in custodial limbo. The threat to Ms. Emanuel warrants a reduction of her sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i) in order to maximize her safety and health.

## A.      Procedural Background.

Ms. Emanuel pled guilty on December 10, 2019, to mail fraud in violation of 18 U.S.C. § 1341 and aggravated identity theft in violation of 18 U.S.C. § 1028A. Doc. 214 (Judge Mendez took the plea). Just after the pandemic hit, she appeared in person for sentencing (the Court appearing by video in perhaps a first for the district) and joined the government in recommending a 75-month sentence (51 months for mail fraud followed by a mandatory 24 months term), recommendations the Court adopted. Doc. 238. The Court advanced sentencing at her request to accommodate her concerns about poor conditions and treatment at the Sacramento County Jail, which had plagued her for three years. *See* doc. 225.

The Court ordered Ms. Emanuel transferred to the BOP and she anticipated she would be quickly moved from the jail, but she remained in Sacramento until early June, when the Marshals took her to Nevada Southern Detention Center in Pahrump, Nevada, a private jail that contracts with the Justice Prisoner & Alien Transportation System (JPATS) to hold prisoners in transit from one facility to another. The Marshal advised counsel that BOP had designated Ms. Emanuel to serve her sentence at FCI Victorville Medium II Camp, part of the Victorville federal correctional complex. Ms. Emanuel has yet to reach a BOP facility.

Ms. Emanuel recently alerted defense counsel that the jail in Pahrump had alerted prisoners to a positive COVID-19 test within the facility. Counsel emailed the local Marshal on July 8 and received the following response, sent to the Marshal by Core Civic, operator of the prison: "We currently have 4 USM Detainees COVID

Positive and 9 Staff COVID Positive." Ex. A. The numbers have since risen but current numbers have not been made available as of this writing.

In the meantime, the Victorville complex, which had been Covid-free, faced its own sudden outbreak. BOP reports Covid statistics on its website, bop.gov. As of Monday, July 13, BOP reported a total of 93 active inmate cases and nine staff cases, including 33 inmates ill at the FCI Medium II. The number of active cases doubled in five days: on July 18, BOP reports 186 active inmate cases. The number today (July 27) is 243.

On June 29, defense counsel mailed Ms. Emanuel's medical records to the warden at Victorville Medium II along with a request that the warden consider shifting Ms. Emanuel to home detention or recommending compassionate release. Ex. B. To date, the warden has not responded to any of defense counsel's three emails requesting information. Telephone inquiries have been even less successful – during a call in June, the prison would not provide counsel the warden's name.[1]

**B. Applicable Law.**

The "compassionate release" statute, section 3582(c)(1)(A)(i) of Title 18, U.S. Code, gives the Court authority to reduce Ms. Emanuel's sentence of imprisonment to time served for "extraordinary and compelling reasons."

The statute provides:

(1)    in any case—

(A)    the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the

_____

[1]    BOP has faced widespread criticism about the methods of its reporting and the accuracy of its statistics. https://www.forbes.com/sites/walterpavlo/2020/05/20/federal-judges-are-relying-on-bureau-of-prisons-covid-19-numbers-to-make-rulings/#594b8fdb12c7;

unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)      extraordinary and compelling reasons warrant such a reduction; . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).  In short, to grant relief under the statute, the court must, first, find "extraordinary and compelling reasons warrant such a reduction" and, second, find "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; third, the Court must "consider[] the factors set forth in section 3553(a) to the extent that they are applicable."

The compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons, but Congress amended the statute in the First Step Act of 2018.  Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018).  The amended law provides that courts may consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," *or* after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts."  *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020).

### C.      Ms. Emanuel Has No Warden and Exhaustion Should Therefore Be Waived or Satisfied.

Although she was sentenced four months ago and is serving a prison sentence imposed by a federal district court, Ms. Emanuel is not in BOP custody and therefore

has no warden who can be relied upon to address her request for action. She has nevertheless satisfied the 30-day by providing a written request for action to her prospective warden who has not replied.[2]

Courts during the pandemic have deemed compassionate release motions filed directly with the Court to be proper, notwithstanding the lack of word from a BOP warden, where "the exhaustion of administrative appeals process was no[t] applicable or possible" and a BOP employee specifically "suggested contacting the sentencing Court for relief."[3] *United States v. Teresa Ann Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *1 (E.D. Wash. Mar. 31, 2020). A defendant in similar circumstances was deemed "caught in a Catch-22" because "neither the warden at Wyatt [a non-BOP facility] nor the BOP will consider his request because of his designation to Wyatt, a non-BOP facility." *United States v. Jepsen*, No. 3:19-CV-73 (VLB), 2020 WL 1640232, at *3 (D. Conn. Apr. 1, 2020)(internal quotation marks omitted). The court in *Jepsen* considered the merits of defendant's motion, citing his incarceration at a non-BOP facility with no BOP warden as satisfying the exhaustion of all administrative rights properly under 18 U.S.C. § 3582(c)(1)(A). *Id.* at **1, 3. Yet another court found that requiring defendants to fully exhaust administrative remedies would be "unduly prejudicial" because "[e]ach day that Defendant spends in confinement, he is at a heightened risk of contracting the COVID-19 virus." *United States v. Feucht*, No. 11-CR-60025, 2020 WL 2781600, at *3 (S.D. Fla. May 28, 2020).

Ms. Emanuel is in the same boat as these prisoners. First, she has no warden to ask for compassion. Second, she is housed in a private prison not connected to the

---

[2]     Defense counsel submitted a request on her behalf to the warden at Victorville, where she was supposed to serve her sentence. Ex. C. Counsel sent the letter electronically and by mail on June 29. Ex. B. The warden has not responded to the letter or to subsequent email inquiries.

[3]     Nevada Southern Detention Facility has advised its inmates that it cannot respond to request for compassionate release and that such requests should be made directly to the sentencing court.

BOP. Third, nobody can predict when if ever she will reach Victorville. Because she *cannot* pursue administrative remedies, the Court should consider her motion..

    **D. Extraordinary and Compelling Reasons Warrant a Reduction of Ms. Emanuel's Sentence to Assure Her Safety During the Pandemic.**

Ms. Emanuel's medical conditions, the COVID-19 pandemic, its impact on prisoners and the communities in which they are imprisoned, the risk of future suffering, and the virus's taxing of limited medical resources are extraordinary and compelling reasons to reduce Ms. Emanuel's sentence to time served.

    **i. The Court May Determine What Reasons Are Extraordinary and Compelling.**

Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. 994(t). The Commission's policy statement, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" in the application notes. The examples generally fall into four categories based on (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary includes a fifth catch-all provision for the unforeseen: any "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment n.1(D).

After the First Step Act amendment, and especially since the onset of the COVID-19 pandemic, many Courts have defined "extraordinary and compelling reasons" independently of the narrow terms of the Sentencing Commission policy statement, which became outdated upon passage of the First Step Act. The Act conferred substantially more power to the Court to rule upon motions for compassionate

release but the Commission, lacking a quorum, has never addressed the amendment.[4] The policy statement was last amended in November 2018, before the First Step Act was passed, when the statute required that any motion be filed by the BOP.  After the First Step Act amendment, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020)(internal quotation marks omitted); see also *United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (citing cases).

In *United States v. Cantu*, the Court explained:  "[g]iven the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582."  No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019)(emphasis in original).  Similarly, in *Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants."

---

[4]     *See, e.g., United States v. Schafer*, No. 18-6152, 2020 WL 2519726, at *4 (W.D.N.Y. May 18, 2020)("anachronistic nature of Application Note 1 is demonstrated by the catch-all provision's sole reference to the BOP Director, but . . . other courts that have concluded that the discretion afforded the BOP Director under that catch-all provision also extends to a court considering a compassionate release motion, consistent with the expansion of § 3582(c)(1)(A) relief under the First Step Act"); *United States v. Pabon*, No. 17-165-1, 2020 WL 2112265, at *2 (E.D. Pa. May 4, 2020)("policy statement may provide helpful guidance but it doesn't limit the Court's independent assessment of whether extraordinary and compelling reasons exist"); *United States v. Marks*, No. 03-6033, 2020 WL 1908911, at *7 (W.D.N.Y. Apr. 20, 2020)("when a defendant brings a motion for sentence reduction based on extraordinary and compelling circumstances, the court effectively steps into the shoes of the BOP director, and makes its own determination"); *United States v. Young, supra*, No. 00-02-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020)("district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release"); *United States v. Beck*, 425 F.Supp. 3d 573, 579 (M.D.N.C. 2019)("policy statement provides helpful guidance [but] does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)").

2020 WL 1248493, at *6.  *Redd* held "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"  *Id.*

Even where courts have not deemed § 1B1.13 inapplicable due to the lack of action by the Commission, they have held that judges have authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed.  *See, e.g., United States v. Fox,* No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019)(existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change").  In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance."  2020 WL 1248493, at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020)("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it."  The government conceded this point in *United States v. Young*, agreeing that "dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."  No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020).  *Young* followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction."  *Id.*

Accordingly, this Court has authority to consider whether the pandemic, combined with other circumstances, presents an extraordinary and compelling basis for

a sentence reduction, regardless of whether it falls within one of the existing categories in § 1B1.13 commentary.

### ii. Ms. Emanuel's Medical Conditions Warrant a Sentence Reduction.

Ms. Emanuel, age 59, has multiple medical conditions that put her at grave risk if she is infected with COVID-19, which appears to be inevitable among U.S. prisoners.[5] Her conditions have been recognized by the Center for Disease Control as exceptional risks: asthma (a lifelong problem), obesity (her body-mass index is 34.0), hypertension, and age. While any *one* of these conditions places her at greater risk, the *combination* of the conditions makes the risk to her greater still. As Chief Judge Mueller noted in a recent order granting relief for a 40-year-old defendant, "it is not any one of these conditions alone that creates a greater risk of suffering severe illness from COVID-19; instead, it is the 'particular danger' he faces given his combined conditions of diabetes, hypertension and asthma . . . . As other courts have found, suffering from the combination of these specific health conditions can provide an extraordinary and compelling reason warranting a sentence reduction." *United States v. Bradley*, 2:14-CR-0093-KJM, doc. 69 (July 7, 2020)(citing cases).

Since her arrest in 2017 Ms. Emanuel was largely housed and treated at the Sacramento County Jail. Counsel has provided copies of her most recent medical summary to the government and will file the records under seal should the response to this motion make expansion of the record necessary. Counsel has also consulted with MD Catherine Pearson of the University of California, San Francisco, whose opinions inform this section of the memorandum. A declaration from Dr. Pearson will be filed when completed.

---

[5]    The New York Times reported on the morning of July 21, 2020, "In American jails and prisons, more than 100,000 people have been infected and at least 763 inmates and correctional officers have died," with jails and prisons being the worst "clusters." https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#clusters

Sacramento County Jail medical staff reported as of May that Ms. Emanuel has the following active medical problems material to this motion:  obesity (the records list her body-mass index as 30 to 34.9); hypertension (coded in the records as "HTN"; she is prescribed medication for it); and asthma (a lifelong problem for which she is prescribed two inhalers as part of her breathing treatment).[6]  She also has post-traumatic stress disorder (PTSD) as a result of past trauma in her personal life.  These conditions are also noted in her presentence report prepared in early February, prior to the COVID-19 pandemic.  PSR, doc. 227, at ¶¶ 59, 60.  Records from her pre-arrest treating physician confirm several of these conditions and also state that she was pre-diabetic as of 2016 and has traits for thalassemia and sickle-cell anemia, which are blood disorders.

Ms. Emanuel is 59 years old.  The CDC advises that, "As you get older, your risk for severe illness from COVID-19 increases. For example, people in their 50s are at higher risk for severe illness than people in their 40s. Similarly, people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s."[7]  The agency also advises underlying medical conditions" The most recent CDC guidelines say that "[p]eople of any age" who have obesity, defined as a body mass index of 30 or higher, "**are at increased risk** of severe illness from COVID-19."[8]  They provide that "[h]aving moderate-to-severe asthma may increase your risk for severe illness from COVID-19."[9]  "Hypertension or high blood pressure" is also listed as a COVID-19 risk

---

[6]     Jail records also describe her as having opiate- and sedative-abuse issues, but these entries are *incorrect*.  Ms. Emanuel has no drug-abuse history.

[7]     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html

[8]     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html

[9]     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

factor.  *Id.*  Ms. Emanuel therefore has three conditions placing her at risk, notwithstanding her age.[10]

Several judges of the district have reduced the sentences of inmates who fit a similar health profile.  Judge Drozd ordered the release of 59-year-old Bonnie Recinos who has served 32 months of a 55-month term in light of her diagnoses of multiple sclerosis, hypertension, and asthma, noting that "in a mere month and a half, the active COVID-19 cases at FMC Carswell went from 0 to 180."  *United States v. Recinos*, 1:12-CR-00356 DAD (Order July 21, 2020, doc. 132).  Judge Mendez ordered the release of "middle-aged" Barlow Richardson after 38 months of a 72-month drug sentence in light of his hypertension, severe obesity, and pre-diabetes.  *United States v Richardson*, 2:17-CR-0048 JAM (Order, June 19, 2020, doc 81).  Chief Judge Mueller ordered the release of Jeremy Head who had served just over half of a 120-month fraud sentence in light of his history of asthma.  *United States v. Head*, 2:08-CR-0093 KJM (Order, June 15, 2020, doc. 1719).  Judge Nunley ordered the release of Harvey Sewell, a 57-year-old with diabetes, hypertension, and cardiac arrhythmia serving a 235-month sentence for distributing crack cocaine.  *United States v. Sewell*, 2:05-CR-0554 TLN (Order, June 5, 2020, doc. 308).

### iii.    The COVID-19 Pandemic Presents Multiple Extraordinary and Compelling Reasons Warranting a Sentence Reduction.

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction.  Black's Law Dictionary, defines "extraordinary" as "[b]eyond what is usual, customary, regular,

---

conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#asthma

[10]    Her records also confirm "thalassemia," which is a blood disorder, and older records show evidence of sickle cell anemia, both of which are listed as substantial COVID-19 risk factors.  Ms. Emanuel's records do not reflect any ongoing treatment for these conditions and it may be that she is classified as a carrier rather than as a person having these conditions herself.  Dr. Pearson's review of the records is pending.

or common," BLACK'S LAW DICTIONARY (11th ed. 2019). It defines "compelling need" as one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.* Using these plain terms, the present global pandemic is a quintessential extraordinary circumstance beyond what all Americans have experienced in their lifetimes.

It is beyond dispute, four months into the pandemic, that COVID-19 is an unprecedented health emergency that presents a serious risk of illness and death to all persons. The only citation needed is to the government's own statistics – as of this evening, nearly four million cases and over 140,000 dead.[11]

Also beyond dispute is the impact of COVID-19 on prisons and jails. Prisons and jails are amplifiers of infectious diseases such as the coronavirus because social distancing is impossible inside and movement in and out of facilities is common. The outbreaks start small then explode like a box of matches exposed to a small flame, as California recently observed when the virus hit San Quentin State Prison following the transfer of an infected prisoner from another prison.[12] As of today, "BOP has 129,100 federal inmates in BOP-managed institutions and 13,827 in community-based facilities . . . . There are 4,353 federal inmates and 397 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 5,676 inmates and 648 staff have recovered. There have been 99 federal inmate deaths and 1 BOP staff member death

_____

[11]     Pulled from Center for Disease Control Covid Data Tracker at 4:00 p.m. P.D.T. on July 21, 2020. Go to this link for current statistics: https://www.cdc.gov/covid-data-tracker/#cases

[12]     1302 prisoners infected, 11 dead, as reported by the California Department of Corrections and Rehabilitation on Wednesday, July 15, 2020.

For a similar example, the Court should look at the numbers at the BOP's Victorville Correctional Complex, where an outbreak appears to be underway after months of no reported cases. On Monday BOP reported a total of 93 active cases at the entire complex. Tonight, July 17, it reports 152 active cases.

attributed to COVID-19 disease."[13]  The Bureau provides a graphic showing the extent of the problem in its facilities:



Incarcerated people "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[14]   And the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.   As courts have recognized, there can be no doubt that "the COVID-19 virus spreads with uncommon and frightening speed in carceral settings."  *United States v. Skelos*, 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020).  "Jails and prison[s] are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment."  *Id.*

Ms. Emanuel has complained about the lack of sanitation and safe care in her housing since long before the pandemic began.  In a bail review motion filed in April 2019, counsel argued, "The catalyst for this motion lay in undersigned counsel's concern that prolonged detention has been (and will continue to be) detrimental to Ms.

---

[13]   https://www.bop.gov/coronavirus/, pulled on July 24, 2020.
[14]   *Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), https://perma.cc/KGP7-PDVJ.

14

Emanuel's physical and mental health, impairing her ability to focus her attention on the case." Doc. 176 at 5. She renewed these arguments in early February (before the pandemic) to accelerate her transfer out of Sacramento County Jail. Doc. 225.

A person's risk of exposure to COVID-19 is significantly greater in prison than it is outside of prison. Thus, "the best – perhaps the only — way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible." *United States v. Nkanga*, No. 18-CR-713, 2020 U.S. Dist. LEXIS 56188, at *1 (S.D.N.Y. Mar. 31, 2020) (emphasis added).

Prison officials are powerless to reduce breathing, coughing, sneezing, or movement in the cramped, communal spaces of prisons. In addition, since the start of the pandemic, reports have poured in about BOP's incompetence at every level, including non-existent education to inmates and correctional officers about the spread of the virus, dubious staffing decisions undermining the safe-keeping of quarantined inmates, and inadequate testing to confirm the number of cases.[15]

The government itself has recognized the critical importance of reducing incarcerated populations. In April, the Attorney General instructed BOP to reduce the prison population by shifting prisoners to home detention specifically to reduce the risk of infection posed by overcrowding.[16] Governor Gavin Newsom has arranged for the early release of 8,000 state prisoners to stem the spread.[17]

The district courts have recognized the need for urgent action. In *United States v. Copeland*, the court granted a sentence reduction to time served under another

---

[15] See, e.g., K. Blakinger & K. Hamilton, "I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps, The Marshall Project (June 18, 2020). https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps

[16] Memorandum, April 3, 2020, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 https://www.justice.gov/file/1266661/download.

[17] https://www.sfchronicle.com/crime/article/Newsom-to-announce-8-000-new-prison-releases-15399956.php

portion of the First Step Act to a defendant serving a life sentence for a drug trafficking conspiracy and firearm possession. No. 2:05-cr-00135-DCN, ECF No. 662 (D. S.C. Mar. 24, 2020). While the court recognized that defendant's "tenuous health condition" put him at "higher risk for severe illness and possible death" from COVID-19, *id.* at 7, it also considered letters from members of Congress as evidence of its "desire for courts to 'use all available powers and authorities . . . to reduce the number of federal prisoners in . . . prisons,'" especially for elderly and sick individuals and for persons who are within the last 36 months of their sentences who may be appropriate for release to home confinement. *Id.*(quoting Letter of House Judiciary Committee, Mar. 19, 2020).

On July 14, 2020, District Judge Consuelo Marshall of the Central District of California ordered officials at FCI Lompoc to identify vulnerable inmates and to transfer them to home confinement.[18] She ordered them to identify all inmates over 50 having underlying health conditions – a class that includes Ms. Emanuel – and to begin releasing them. Because Ms. Emanuel has been in custodial limbo since sentencing, never reaching the BOP, there is no BOP official who can transfer her to home confinement for the remainder of her sentence. However, the Court can accomplish the same goal by reducing her sentence to time served and by placing her on home detention as a condition of supervised release.

### iv. Ms. Emanuel Should Be Released.

After meeting the first two conditions for compassionate release (exhaustion & compelling reason for release), the Court must weigh whether the individual is "a danger to the safety of any other person or to the community." *See, e.g., U.S. v. Lucas*, 2020 WL 2059735 at *4 (W.D.N.Y April 29, 2020) (citing U.S. Sentencing Guideline §1B1.13(2) (2018) (policy statement for sentencing reductions)).

---

[18] https://lompocrecord.com/news/local/crime-and-courts/lompoc-prison-ordered-to-begin-release-of-inmates-to-home-confinement-due-to-covid-19/article_a8713d25-6499-582a-a9b1-89e1c63cf803.html

Ms. Emanuel is not a danger.  She is 59 years old and has no history of violent or predatory conduct.  Her offense involved providing identifying information to aid co-defendant Gregory Lee in filing fraudulent unemployment claims, information she was able to access when employed by the State of California.  Because the crime required access she will not have again, the conduct will not recur. She will be under supervision of federal probation for the three years ordered by the Court, subject to search conditions and financial restrictions.  Also, the judges of this district in granting compassionate release have distinguished between violent and non-violent offenders in assessing dangerousness.  Thus, for example, Judge Nunley ordered the release of Harvey Sewell who was serving an already-reduced 235 month sentence for distributing crack, noting the offense was "nonviolent."  2:05-CR-0554 TLN, Order doc. 308 at 6:9.  Chief Judge Mueller reached the same conclusion as to Jeremy Head, whose fraud caused a loss of over $8 million to over 50 individual victims.  2:08-CR-0093 KJM, Order doc. 1719 at 14:4-5 ("Defendant's crime is a serious one, but it is nonviolent" [and] "[d]efendant ha served over half of his 120-month sentence").  Judge Drozd rejected the argument that Ms. Recinos continued to be a danger because she "'was a leader in an elaborate $1.5 million fraud scheme.'"  1:12-CR-0035 DAD, Order doc. 132 at 9.

Reducing Ms. Emanuel's sentence to time served is also consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).  The sentence the Court imposed is Ms. Emauel's only term of imprisonment, ordered when she was 59.  While it was intended to "punish" and "deter" within the meaning of section 3553, the punishment she has endured since her arrest in May 2017 has been unusually severe.  First, during the three years she spent in pretrial detention, she lacked the opportunities for programming and recreation presented to other prisoners.[19]  Second, because inmates at Sacramento County are locked in their cells for an average of 23 hours per day, she had minimal recreation and no access to sunlight during nearly all of over 39 months of

---

[19]     Despite scarce programming opportunities at Sacramento County Jail, Ms. Emanuel completed every program available to her and earned the certificates attached as exhibit D.

imprisonment.  Third, as noted above, her experience of confinement was harsh and disturbing to her because of her PTSD and other stressors.  Fourth, since the pandemic began in March, her fear for her personal safety has only grown.  The first inmate to test positive in Sacramento was a woman housed on the seventh floor.  As a result, Ms. Emanuel was quarantined in Sacramento for two weeks.  After she was moved to Pahrump, she was again quarantined for two weeks amidst rumors of a nascent COVID-19 outbreak.  These are experiences she will never risk again.

 Finally, the raging of COVID-19 in prisons and jails means that the time remaining on her sentence will be harsher than envisioned when she was sentenced, with Ms. Emanuel and other prisoners having to endure widespread and lengthy lockdowns, limited showers, no work opportunities, and little or no recreation.

v.     **Ms. Emanuel's Family Prepared Her Release Plan.**

Exhibit E to this motion consists of letters of support from Ms. Emanuel's family, friends, and supporters describing the positive role she has played in the lives of others. Her daughter Pamela Edy Emanuel, who graduated from California State University in San Jose in 2019, prepared the document and provided it to defense counsel to support her mother.  Pamela Edy is able to house her mother in San Jose.  The documents onvey Ms. Emanuel's importance to her friends and loved ones, but they also describe the particular horror she has experienced first as an inmate in Sacramento County and, most recently, as a person confined close to others in small, dangerous, and unhygienic quarters during an enduring pandemic that has claimed nearly 150,000 lives in the U.S. alone.  Ms. Emanuel's friends and loved ones join undersigned counsel in urging the Court to reduce Ms. Emanuel's sentence to time served.

/ / /

/ / /

/ / /

/ / /

/ / /

**E.      Conclusion.**

Ms. Emanuel respectfully asks the Court to reduce her sentence to time served.

Respectfully Submitted,

HEATHER E. WILLIAMS
Federal Defender

Dated:  July 28, 2020          /s/ T. Zindel
                               TIMOTHY ZINDEL
                               Assistant Federal Defender
                               Attorney for PAMELA EMANUEL